J-A22023-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: G.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 381 MDA 2020 |

Appeal from the Order Entered February 21, 2020
In the Court of Common Pleas of Columbia County Juvenile Division at
No(s):  206-OC-2018,
207-OC-2018, CP-19-DP-0000015-2016,
CP-19-DP-0000016-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: H.R.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 382 MDA 2020 |

Appeal from the Order Entered February 21, 2020
In the Court of Common Pleas of Columbia County Juvenile Division at
No(s):  CP-19-DP-0000016-2016

| | | |
|---|---|---|
| IN RE: G.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 383 MDA 2020 |

Appeal from the Order Entered February 21, 2020
In the Court of Common Pleas of Columbia County Orphans' Court at
No(s):  206-OC-2018

IN RE: H.R.S., A MINOR      :    IN THE SUPERIOR COURT OF
                                      :        PENNSYLVANIA
                                      :

APPEAL OF: M.S., FATHER       :
                                      :
                                      :
                                      :
                                      :
                                      :
                                      :    No. 384 MDA 2020

Appeal from the Order Entered February 21, 2020
In the Court of Common Pleas of Columbia County Orphans' Court at
No(s):  207-OC-2018

BEFORE:  SHOGAN, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY SHOGAN, J.:             **FILED OCTOBER 23, 2020**

M.S. ("Father") appeals from the orders entered on February 21, 2020, that involuntarily terminated his parental rights and changed the permanency goals from reunification to adoption with respect to his daughters, G.M.S., born in March of 2014, and H.R.S., born in April of 2015 (collectively, "the Children").[1]  After careful review, we affirm.

We summarize the relevant facts and procedural history as follows.   In July of 2015, Columbia County Children and Youth Services ("CYS") initiated services for this family due to concerns regarding substance abuse, housing instability, and the parenting skills of Father and Mother.  N.T., 12/4/19, at 10–11.  On November 17, 2015, Father and Mother were incarcerated on

---

[1] By the same orders, the court involuntarily terminated the parental rights of K.B. ("Mother").  Mother timely filed notices of appeal, which we address by separate memorandum.

charges involving the possession of methamphetamine. ***Id.*** at 13, 57, 114; CYS Exhibits 11, 13.

Due to Father's and Mother's incarceration and substance abuse, CYS filed dependency petitions in March of 2016. N.T., 12/4/19, at 14. The juvenile court adjudicated the Children dependent on April 6, 2016, and placed them in foster care. ***Id.***; Findings of Fact, Conclusions of Law and Order, 2/21/20, at 2, ¶ 5. The court established reunification as the Children's permanency goal. N.T., 12/4/19, at 19. In furtherance of that goal, Father and Mother were required to participate in drug and alcohol evaluations and follow all recommendations, as well as submit to random drug screens and refrain from illegal drug use. ***Id.*** at 17. Father and Mother also were required, *inter alia*, to complete parenting classes and demonstrate an increase in parenting skills and knowledge. ***Id.*** at 18.

During the past four plus years in which the Children have been dependent, Father mostly has been confined in prison, halfway houses, or rehabilitation centers, the latter of which were conditions of his parole. After Father's arrest on November 17, 2015, he pleaded guilty to the charge of manufacture, delivery, or possession of illegal drugs,[2] for which he received a maximum sentence of twenty-four months of incarceration followed by a consecutive sentence of eight months of probation. CYS Exhibit 13 at 3.

---

[2] 35 P.S. § 780-113 (a)(30).

Father was admitted into the State Intermediate Punishment ("S.I.P.") program. N.T., 12/4/19, at 55. The orphans' court found that Father "was incarcerated from November 17, 2015[,] until August 25, 2017[,] at various locations . . . . [and] incarcerated in Luzerne County Prison from August 25, 2017[,] through February 6, 2018[,] due to a charge of escape . . . for which Father entered a plea of guilty." Findings of Fact, Conclusions of Law, and Order, 2/21/20, at 5, ¶¶ 49–50; N.T., 1/8/20, at 72, 74, 83–84. As a result, Father was removed from the S.I.P. program. N.T., 12/4/18, at 55; N.T., 1/8/20, at 107. Father was released on December 27, 2018. N.T., 1/8/20, at 87. Thereafter, Father resided with his mother, but only until February 28, 2019, when he was re-incarcerated for violating his parole by using methamphetamine. *Id.* at 92–95, 108. Father was confined until July 30, 2019, at which time he was released and began residing in his own apartment. *Id.* at 95–97. However, Father again violated his parole by using methamphetamine. *Id.* at 103–104. He was re-incarcerated and placed in a rehabilitation facility on November 15, 2019. *Id.* at 97.

In the *interim*, on November 2, 2018, CYS filed petitions for a goal change to adoption and petitions for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (5), (8), and (b). A

hearing on the petitions occurred on December 4, 2019, and January 8, 2020.[3]

CYS presented the testimony of the Children's caseworker, Brittany Hacker. Father testified on his own behalf, and he revealed that he was then residing in a rehabilitation center.  N.T., 1/8/20, at 99.

_____

[3]  During the hearing, an attorney-guardian *ad litem* (GAL) represented the legal and best interests of the Children, then four and five years old.  However, the orphans' court had appointed separate counsel to represent the Children's legal interests.  The GAL stated on the record in open court that legal counsel had previously informed the court that there was no conflict between the Children's legal and best interests.  N.T., 12/4/19, at 2-6.  Therefore, the Children's legal counsel did not represent the Children at the hearing.

We conclude that the court complied with **In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017), which held that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary-termination proceeding has a statutory right to counsel, who discerns and advocates for the child's legal interests and which the Court defined as a child's preferred outcome. **L.B.M.**, 161 A.3d at 180.  In addition, the court complied with **In re T.S.**, 192 A.3d 1080 (Pa. 2018), which held that, in cases where there is no conflict between a child's legal and best interests, a GAL "representing the child's best interests can also represent the child's legal interests. . . ." **Id.** at 1092; **see also In re Adoption of K.M.G.**, 219 A.3d 662, 670 (Pa. Super. 2019) (*en banc*) (citation omitted), *appeal granted in part*, 221 A.3d 649 (Pa. 2019) (holding that this Court

> does **not** have the authority [to] review *sua sponte* whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding.  Rather, . . . this Court's authority is limited to raising *sua sponte* the issue of whether the orphans' court violated Section 2313(a) by failing to appoint **any** counsel for the [c]hild in a termination hearing.).

(emphases in original).

By orders dated and entered on February 21, 2020, the orphans' court involuntarily terminated Father's parental rights and changed the Children's permanency goals to adoption.[4]  Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.  The orphans' court filed a Rule 1925(a) opinion on March 5, 2020.

On appeal, Father presents the following issues for our review, which we have re-ordered for ease of disposition:

> 1. Did the [orphans'] court commit an error of law and abuse of discretion when it determined that [CYS] presented clear and convincing evidence in support of terminating the parental rights of [F]ather?
>
> 2. Did the [orphans'] court commit an error of law and abuse of discretion when it determined that [CYS] proved by clear and convincing evidence that termination was appropriate under 23 Pa.C.S.A. § 2511(a)(5) and § 2511(a)(8) when the [C]hildren were not removed from Father's care because he was incarcerated five (5) months prior to the [C]hildren becoming dependent?
>
> 3. Did the [orphans'] court commit an error of law and abuse of discretion when it determined that the conditions that lead [sic] to the removal of the [C]hildren continue to exist and termination of parental rights would best serve the needs and welfare of the [C]hildren, where Father completed parenting classes, drug/alcohol counseling and classes and was one month from being released from state prison when [CYS] filed the Petitions for Goal Change and Involuntary Termination of Parental Rights?

---

[4]  The GAL stated on the record in open court that it is in the Children's best interests that Father's parental rights be terminated and their goals be changed to adoption.  N.T., 12/4/19, at 6.

4. Did the [orphans'] court commit an error of law and abuse of discretion when it determined that the best interest of the [the C]hildren would be served by terminating parental rights when testimony from the caseworker supported a bond between [F]ather and [C]hildren and there was no testimony, expert or otherwise, concerning the effect on the [C]hildren of permanently severing the bond with [F]ather?

5. Did the [orphans'] court commit an error of law and abuse of discretion when it determined that [CYS] presented clear and convincing evidence in support of changing the goal from reunification to adoption?

Father's Brief at 17–19.

We review Father's first issue for an abuse of discretion as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of

- 7 -

the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The relevant provisions of Section 2511 in this case are as follows.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

- 8 -

* * *

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (5), (8), (b).

We review the termination orders pursuant to Section 2511(a)(1). **See**

***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that, this Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights).[5]

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to

_____

[5] Based on this disposition, we need not review Father's second and third issues on appeal. However, it is important to note that Sections 2511(a)(5) and (8) do not provide a basis for the termination of Father's parental rights because, at the time of the Children's placement, Father was incarcerated. Therefore, contrary to the statutory requisite, the Children were not removed from his care. ***See In re C.S.***, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*) (stating that Section 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights when he was incarcerated at the time of the child's removal from the mother's care).

relinquish parental claim to a child or a refusal or failure to perform parental duties." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008) (citing ***In re Adoption of R.J.S.***, 901 A.2d 502, 510 (Pa. Super. 2006)). Further,

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

***Id.*** (quoting ***In re Adoption of Charles E.D.M.***, 708 A.2d 88, 92 (Pa. 1998)).

In ***In re Adoption of S.P.***, 47 A.3d 817 (Pa. 2012), our Supreme Court discussed ***In re Adoption of McCray***, 331 A.2d 652 (Pa. 1975), a case wherein the Court considered the issue of the termination of parental rights of incarcerated persons involving abandonment, which is currently codified at Section 2511(a)(1). The ***S.P.*** Court stated:

> Applying in ***McCray*** the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." ***Id.*** at 655. We observed that the father's incarceration made his performance of this duty "more difficult." ***Id.***

***Adoption of S.P.***, 47 A.3d at 828. Continuing to quote ***McCray***, 331 A.2d at 655, the ***S.P.*** Court continued:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. **Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the**

**child**.  Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

***Adoption of S.P.***, 47 A.3d at 828 (emphasis added); ***see also In re B.,N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004) (stating that a parent does not perform his parental duties by displaying a "merely passive interest in the development of the child").

With respect to Section 2511(b), we have explained, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted).  Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." ***Id.*** (citation omitted).  However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.  The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762–763 (Pa. Super. 2008) (citation omitted).

Father argues that CYS failed to satisfy its burden of proof with respect to Section 2511(a)(1).  Specifically, Father contends that he never expressed a desire to relinquish his parental rights; he did everything in his power to perform his parental duties while incarcerated; and he exercised reasonable firmness in maintaining his relationship with the Children.  Father's Brief at

28. In addition, Father asserts that he completed parenting classes and drug and alcohol counseling while incarcerated. *Id.* at 29.

The orphans' court found that Father did indeed complete a parenting course while incarcerated. Findings of Fact, Conclusions of Law and Order, 2/21/20, at 8, ¶ 75; N.T., 12/4/19, at 40, 48, 123. Likewise, as part of his parole conditions, Father completed inpatient drug and alcohol rehabilitation. N.T., 12/4/20, at 40–41, 123. However, the court found that Father "has failed to achieve the minimum requirements necessary to be reunified with the Children largely because Father continues to use illegal drugs . . . ." Findings of Fact, Conclusions of Law and Order, 2/21/20, at 2, ¶ 17.

Father's own testimony supports the court's finding insofar as he acknowledged relapsing on methamphetamine in November of 2019. N.T., 1/8/20, at 103–104, 108. In addition, the CYS caseworker, Brittany Hacker, testified that Father tested positive for amphetamine and methamphetamine on October 18, 2019. N.T., 12/4/19, at 38. Further, Ms. Hacker testified that Father did not cooperate with random drug testing on September 6, 2019, September 9, 2019, or November 25, 2019. *Id.* at 36–40. Finally, by the time of the subject proceeding, Father was again residing in a drug and alcohol rehabilitation center. *Id.* at 42, 113. As such, the record demonstrates that Father did not comply with the permanency objective to refrain from illegal drug use and to participate in a random drug testing.

Because of Father's drug addiction and related illegal activity, as well as his escape from the halfway house, Father was confined for all but approximately six non-consecutive months during the Children's dependencies. Ms. Hacker testified that Father requested visitations and telephone calls with the Children while confined in prison, a halfway house, or a rehabilitation facility. N.T., 1/8/20, at 26. Ms. Hacker testified that she attempted to schedule visitation and telephone calls, but they were not always permitted, such as when he was incarcerated at State Correctional Institution-Camp Hill. *Id.* at 25–26. Similarly, Ms. Hacker's attempts were unsuccessful on occasion due to Father's prison counselor not returning her telephone calls. *Id.*

In total, CYS scheduled thirty-three visits for Father and the Children, and Father attended seventeen of them. N.T., 1/8/20, at 14. Specifically, in 2016, Father had no visits with the Children. N.T., 12/4/19, at 124. In 2017, Father resided in the halfway house for the majority of that year, and he participated in eight of thirteen scheduled visits. N.T., 1/8/20, at 25; N.T., 12/4/19, at 85, 125. In fact, between April of 2017 through August of 2017, Father was permitted unsupervised visits in the community with the Children. N.T., 12/4/19, at 127–128. Father's visits with the Children reverted to supervised at some time unspecified in the record. *Id.* at 128. In 2018, no visits occurred between Father and the Children. *Id.* at 85, 125. Ms. Hacker testified that in 2019, Father attended nine of twenty scheduled visits, for a

total of ten hours spent with the Children that year. *Id.* at 86; N.T., 1/8/20, at 18–19.

Ms. Hacker testified that Father made efforts to satisfy his permanency plan, including communicating with the Children and CYS, but he has done so inconsistently. N.T., 12/4/19, at 100, 112–113, 120. Ms. Hacker testified, "[N]one of the objectives or tasks have been fully completed which would allow for reunification." *Id.* at 100.

Based on the foregoing, we conclude that the record evidence supports the court's decision to terminate Father's parental rights pursuant to Section 2511(a)(1). Father's conduct throughout this case, well beyond the six months immediately preceding the filing of the termination petition, has evidenced Father's refusal or failure to perform his parental duties to the Children. Therefore, Father's first issue on appeal fails.

In his fourth issue, Father argues that the court abused its discretion in terminating his parental rights under Section 2511(b). Specifically, Father urges that CYS failed to present evidence regarding whether termination is in the best interest of the Children. We disagree.

To the extent Father maintains that CYS did not provide expert testimony regarding the effect on the Children of severing their alleged bond with him, this Court has stated, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation."

*In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

The following case law also is relevant:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533–536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court

observed, "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, Ms. Hacker testified that the Children "have a bond" with Father, and that they refer to him as "Dad." N.T., 12/4/19, at 129. However, she testified that the Children are also bonded to their foster parents, with whom they have resided since December of 2016. *Id.* at 107–108. Ms. Hacker testified as follows on direct examination:

Q. Have you had the opportunity to see the [C]hildren in the home with the foster parents and how often?

A. I have, yes. I visit them once a month in the foster home.

Q. How did the girls refer to the foster parents?

A. They refer to them as Mommy and Daddy.

Q. Have you observed them interact with the foster parents?

A. Yes.

Q. What observations have you made?

A. They are very bonded with the foster parents. They are very loving towards them. They are constantly giving [foster mother] hugs. . . . And they are loving and affectionate to [foster father].

N.T., 12/4/19, at 107–108.

Ms. Hacker testified that the Children's bond with Father is different than that shared with the foster parents. Specifically, she testified that the Children's bond with Father is not as strong as the bond with the foster parents. N.T., 12/4/19, at 129. She explained that when the Children would

see Father they would say, "'Daddy.' They wanted to play. But with the [foster parents] I see more like love and affection . . . in that bond. Where [with] Dad, they were playing[;] they were having fun. Dad brought them gifts and toys." *Id.* at 129–130. We conclude that Ms. Hacker's testimony supports the termination of Father's parental rights pursuant to Section 2511(b) insofar as it reveals that the Children share a bond of sorts with Father but have a parent-child with their foster parents.

In sum, the testimonial evidence demonstrates that the Children's developmental, physical, and emotional needs and welfare will be served by terminating Father's parental rights. The orphans' court found, based on the totality of the testimonial evidence, that:

> Father's long-term drug addiction, and the active phases of that addiction[,] are chronic, as well as Father's incarceration, and all of the above render, and have rendered, Father unable and unavailable to provide for the basic needs of the Children. Father has tried to "get clean," and it is our hope that he can maintain permanent sobriety and recovery, but the Children are real, living, breathing, growing young humans who need stability and predictability in their lives, and Father is and has been unable to provide that for the Children. Frankly, regardless of any good intentions of Father (which has not been consistently the case), he has been given more than four (4) years to step up and be a sober, stable, employed, fully performing [f]ather who can provide a stable home for the Children, and he has been unable to do so. It is time to terminate his parental rights and give the Children a chance at stability, predictability and normalcy.

Findings of Fact, Conclusions of Law and Order, 2/21/20, at 7, ¶ 68. Therefore, Father's fourth issue fails.

- 17 -

In his fifth and final issue, Father argues that the court abused its discretion in changing the Children's permanency goals from reunification to adoption. Father asserts that CYS "did not afford [him] the opportunity, knowing he was going to be released from incarceration, the chance to prove that he could support [the] [C]hildren." Father's Brief at 24–25. In addition, Father asserts that he "has taken steps to substantially comply with" the Children's permanency plans; therefore, it was not in their best interest to change their goals. *Id.* at 25. We disagree.

We likewise review this issue for an abuse of discretion. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). Section 6351(f) of the Juvenile Act, 42 Pa.C.S. § 6301, *et seq.*, provides as follows, in relevant part:

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

\* \* \*

(9) If the child has been in placement for at least 15 of the last 22 months . . . whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child . . . .

42 Pa.C.S. § 6351(f)(1)–(6), (9). "These statutory mandates clearly place the trial court's focus on the best interests of the child." *In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008) (citation omitted). "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." *Id.* (citation omitted) (emphasis in original). Moreover, the burden is on the child welfare agency "to prove the change in goal would be in the child's best interest." *In re D.P.*, 972 A.2d 1221, 1227 (Pa. Super. 2009).

Father's contention that CYS did not provide him the opportunity "to prove that he could support" the Children is without merit. Father's Brief at 25. At the time of the subject proceeding, which was nearly four years after the Children's adjudication, Father was residing in a rehabilitation facility. N.T., 1/8/20, at 99. Ms. Hacker testified that Father failed to inform her that he had returned to a rehabilitation facility. N.T., 12/4/19, at 113. Rather, in the same week that the subject proceeding commenced, Father's paramour advised Ms. Hacker that Father was in the facility. *Id.* Throughout the Children's dependencies, Father had not overcome his addiction to

- 19 -

methamphetamines. He continually violated his parole conditions by relapsing, which resulted in his confinement for all but six non-consecutive months during the relevant period. It follows that the record does not support Father's contention that he "substantially" complied with the Children's permanency plans. Ms. Hacker's testimony demonstrates that Father was inconsistent in his compliance efforts, and that none of the objectives have been fully completed. N.T., 12/4/19, at 100, 112–113, 120. The evidence wholly supports the court's decision to change the Children's permanency goals to adoption. Accordingly, we affirm the orders granting CYS's petitions to involuntarily terminate Father's parental rights and to change the Children's goals to adoption.

Orders affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/23/2020</u>